**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| A.B., an individual, | |
| Plaintiff, | |
| vs. | Case No.: 3:23-cv-00388-IM |
| SHILO INN, SALEM, LLC d/b/a SHILO INN SALEM and | |
| SUMMIT HOTEL TRS 085, LLC d/b/a RESIDENCE INN PORTLAND AIRPORT | |
| Defendants. | |

## COMPLAINT

Plaintiff A.B., by and through undersigned counsel, respectfully submits her complaint for damages and makes the following averments:

## INTRODUCTION

1.      For years, commercial sex traffickers have openly operated in and out of hotels, including the hotel properties owned, operated, and managed by Defendants while Defendants turn a blind eye to ongoing signs of sex trafficking and earn substantial benefits and profits at the expense of human life, rights, and dignity.

2.      Defendants Shilo Inn, Salem, LLC ("Shilo") and Summit Hotel TRS 085, LLC ("Summit") knew and have known for years that sex trafficking activity, including forced prostitution, repeatedly occurs on their properties.

3.      Despite such knowledge, Defendants Shilo and Summit instead turned a blind eye to evidence they knew or should have known were signs of sex trafficking in their hotels, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no effort to train, educate, or otherwise raise awareness to stop the repeated abuses of victims at their properties.

1

4.    This action for damages is brought by Plaintiff, a survivor of sex trafficking, hereinafter identified by her initials, A.B., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5.    A.B. was trafficked for commercial sex at the young age of 22 years old in Oregon. In order to keep a roof over her head, she was forced to "work." A.B. was sold via commercial sex transactions at the Defendants' hotel properties through force, fraud, and coercion. A.B. was preyed upon by a trafficker who bought, sold, and required her to subdue herself sexually to strangers. As she endured brutal physical assaults, psychological torment, and verbal abuse at the Defendants' hotel properties, Defendants turned a blind eye and continued to profit from A.B.'s victimization and exploitation.

6.    Plaintiff first met her trafficker in what she believed to be the beginning of a romantic relationship. Her trafficker used common methods of coercion, including complete control over her, humiliation, degradation, exhaustion, isolation, choking, incurrence of debt, and other methods to force compliance.

7.    A.B. was advertised on websites known for trafficking, including www.backpage.com, whereby the Defendants, through their agreements, terms, or policies related to internet and software, provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise harbor A.B. for the purpose of sex trafficking. Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.B. to be sold repeatedly to buyers who frequented the Defendants' hotel properties to purchase victims of sex trafficking, including A.B.

8.    With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel property, A.B. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotels.

9.    A.B. was trafficked for commercial sex and suffered severe physical and emotional abuse under duress at Defendants' hotels.

10.     With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and consistent refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel properties, A.B. was trafficked, sexually exploited, and repeatedly victimized at the Defendants' hotels.

11.     Plaintiff brings this action pursuant to 18 U.S.C. § 1595 against the Defendants who enabled, harbored, held, facilitated, turned a blind eye to, and financially benefitted from sex trafficking in which A.B. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of the TVPRA.

12.     The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in violations of the TVPRA. Defendants turned a blind eye to knowledge regarding anti-trafficking efforts, including local advances made by local organizations and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking on their properties.

## PARTIES

13.     Plaintiff A.B. is a natural person who currently resides in California.

a.   Plaintiff A.B. was a young adult when she first met the man who would become her trafficker. Using common methods of force, fraud, and coercion, such as the ruse of a romantic relationship, the trafficker forced A.B. into commercial sex, selling her throughout hotels in Washington and Oregon. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102 (16).

b.   Due to the sensitive nature of the allegations, Plaintiff A.B. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit

thereafter.[1]

c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the names of all parties.[2]  However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and commercial sex trafficking. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

e.  Moreover, following the arrest of A.B. and her trafficker, A.B. remained under the manipulative and coercive control of her trafficker for multiple years.

f.  Even after A.B. was finally able to escape the coercive control of her trafficker, the trafficker continued to stalk A.B. and her family for years and made several attempts at unwanted contact despite a No Contact Order.

g.  In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy and safety interests substantially outweigh the customary practice of judicial openness.[5]

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir. 1981); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Supra* n. 1 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his

    h.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

14.    **Defendant Shilo Inn, Salem, LLC d/b/a Shilo Inn Salem ("Shilo")** is an Oregon Limited Liability Corporation with its principal place of business located at 11707 NE Airport Way, Portland, Oregon. Defendant Shilo is a hospitality company and does business as the Shilo Inn Salem located at 3304 Market Street NE, Salem, Oregon ("Shilo Inn Salem"). Defendant Shilo directly offered public lodging services at the Shilo Inn Salem.

    a.  Defendant Shilo can be served through its registered agent at Shilo Management Corporation, Legal Dept, 11707 NE Airport Way, Portland, Oregon.

    b.  Defendant Shilo has its principal place of business in Oregon and regularly conducts business in Oregon.

    c.  Defendant Shilo is subject to the jurisdiction of this Court because it is an Oregon Limited Liability Corporation, regularly does business in Oregon, caused indivisible injuries to Plaintiff in Oregon, contracts to supply services in Oregon, and benefited from the sex trafficking of A.B. and other victims like her at the Shilo Inn Salem located at 3304 Market Street NE, Salem, Oregon.

    d.  As hotel owner, operator, manager, and supervisor, Defendant Shilo controls all training, procedures, and policies for the Shilo Inn Salem where A.B. was trafficked.

    e.  As hotel owner, operator, manager, and supervisor, Defendant Shilo controls

---

or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

human trafficking training, policies, and decisions on implementation and execution of policy for the Shilo Inn Salem where A.B. was trafficked.

f.  Defendant Shilo, as a hotel operator of the Shilo Inn Salem, provided wireless internet access to lodgers.

g.  Defendant Shilo was responsible for the day-to-day operations at the Shilo Inn Salem where A.B. was trafficked and received payment for the rooms in which A.B. was trafficked.

h.  Defendant Shilo knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of A.B. through consistent room rentals at the Shilo Inn Salem.

i.  Defendant Shilo is responsible for hiring and training all staff and employees at the Shilo Inn Salem.

j.  Defendant Shilo participated in a hotel operating venture that included Shilo hotel staff and employees at the Shilo Inn Salem, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Shilo Inn Salem where A.B. was trafficked.

k.  At all times that Plaintiff was trafficked at the Shilo Inn Salem, Defendant Shilo failed or refused to require any human trafficking training despite knowing that trafficking was occurring at its hotel.

l.  Defendant Shilo benefits financially from room rentals, reservation fees, and other incidentals recognized through renting rooms at the hotel property in which the Plaintiff was commercially sex trafficked.

m.  Defendant Shilo has benefited by turning a blind eye to rampant commercial

sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their hotel.

15.     **Defendant Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport ("Summit")** is a Delaware corporation with its principal place of business located 13215 Bee Cave Parkway, Suite B300, Austin, Texas and is registered to do business in Oregon. Defendant Summit is a hospitality company and does business as the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon ("Residence Inn Portland"). Defendant Summit directly offered public lodging services at the Residence Inn Portland.

a.   Defendant Summit can be served through its registered agent at Corporation Service Company, 1127 Broadway Street NE, Ste. 310, Salem, Oregon.

b.   Defendant Summit is subject to the jurisdiction of this Court because it regularly does business in Oregon, caused indivisible injuries to Plaintiff in Oregon, contracts to supply services in Oregon, and benefited from the sex trafficking of A.B. and other victims like her at the Residence Inn Portland located at 9301 NE Cascades Parkway, Portland, Oregon.

c.   As hotel owner, operator, manager, and supervisor, Defendant Summit controls all training, procedures, and policies for the Residence Inn Portland where A.B. was trafficked.

d.   As hotel owner, operator, manager, and supervisor, Defendant Summit controls human trafficking training, policies, and decisions on implementation and execution of policy for the Residence Inn Portland where A.B. was trafficked.

e.   Defendant Summit, as a hotel operator of the Residence Inn Portland, provided wireless internet access to lodgers.

f.   Defendant Summit was responsible for the day-to-day operations at the Residence Inn Portland where A.B. was trafficked and received payment for the rooms in which A.B. was trafficked.

g.   Defendant Summit knowingly benefited or received something of value from

its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of A.B. through consistent room rentals at the Residence Inn Portland.

h. Defendant Summit is responsible for hiring and training all staff and employees at the Residence Inn Portland.

i. Defendant Summit participated in a hotel operating venture that included Summit hotel staff and employees at the Residence Inn Portland, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Residence Inn Portland where A.B. was trafficked.

j. At all times that Plaintiff was trafficked at the Residence Inn Portland, Defendant Summit failed or refused to require any human trafficking training despite knowing that trafficking was occurring at its hotel.

k. Defendant Summit benefits financially from room rentals, reservation fees, and other incidentals recognized through renting rooms at the hotel property in which the Plaintiff was commercially sex trafficked.

l. Defendant Summit has benefited by turning a blind eye to rampant commercial sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their hotel.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

17.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is

brought.

18.    Defendants have submitted to the jurisdiction of Oregon and have purposefully availed themselves of the privilege of conducting acts in Oregon through their dominion and control over their hotels and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Oregon; Oregon has an equally strong interest in protecting and assuring the safety of persons within its State

## SEX TRAFFICKING UNDER FEDERAL LAW

19.    The requirements for direct (or indirect) liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

20.    The TVPRA is a remedial statute and should be liberally construed. It is a cardinal principle of statutory construction that a statute should, on the whole, be construed so that no clause, sentence, or word shall be considered superfluous, void, or insignificant.

21.    Receipt of a percentage (or the entirety) of the room rentals from the rooms A.B. was victimized and trafficked is sufficient for establishing a knowing financial benefit as well as licensing and other fees paid from room rentals under § 1595 (a).

22.    Actual knowledge or a common business purpose is not necessary to establish "participation" under § 1595 (a); to do so would render the "should have known" language in § 1595 meaningless.

23.    Plaintiff need not provide an underlying criminal offense under § 1591 in order to establish liability under the TVPRA.

24.    Constructive knowledge akin to a negligence standard is sufficient for establishing what Defendants "should have known" under § 1595 (a).

25.    Being on notice of the prevalence of commercial sex trafficking generally and at hotels, in conjunction with the open and obvious signs of the same, are sufficient for constructive

and actual notice.

## FACTUAL ALLEGATIONS

### A.  THE SEX TRAFFICKING OF A.B.

26.     The facts alleged herein stem from human trafficking for commercial sex in Oregon. While victimized and exploited by a trafficker, A.B. was continuously subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, and imprisonment at the hotels owned, operated, managed, and supervised by Defendants from approximately the end of 2012 through the end of March 2013.

27.     A.B. met her trafficker online in approximately September of 2012. Under the guise of seeking a romantic partnership, A.B. was thereafter manipulated and forced into commercial sex trafficking. The trafficker sold her as an escort on websites known for sex trafficking and forced prostitution such as Backpage.com. To maintain control over A.B., the trafficker secretly videotaped A.B. during a forced commercial sex act and used the recording as blackmail.

### Sex Trafficking at the Shilo Inn Salem Owned and Operated by Shilo Inn, Salem, LLC

28.     From approximately September 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking at the Shilo Inn Salem located at 3304 Market Street NE, Salem, Oregon ("Shilo Inn Salem").

29.     The trafficker would intermittently rent rooms at the Shilo Inn Salem for approximately one month at a time between approximately September 2012 through March 2013.

30.     A.B.'s trafficker frequently rented rooms at the Shilo Inn Salem because the rooms at this hotel provided a convenient and anonymous location to which he could invite buyers.

31.     A.B.'s trafficker would check into the hotel. The trafficker told A.B. to stay in the car while he checked into the hotel. The trafficker would take A.B. to the room through the back door of the Shilo Inn Salem hotel and provide her with the room key.

32.     On several occasions, the trafficker rented one room at the Shilo Inn Salem where she and another girl were forced to share the room. Plaintiff and the other girl were forced to

alternate in and out of the room meeting "clients" or "dates" and neither one would leave the property. A.B.'s trafficker told her to wait in the lobby while the other victims used the room to have "dates."

33.    While at the Shilo Inn Salem, A.B.'s trafficker took photos of her and used them to advertise on illicit websites known for commercial sex. The trafficker would often use the internet services available at Shilo Inn Salem to advertise A.B. for commercial sex and set up "dates."

34.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag on connectivity throughout the hotel.

35.    Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

36.    Each buyer entering the Shilo Inn Salem was a non-paying guest and left shortly after he arrived. The trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant's Shilo Inn Salem hotel. The foot traffic to the rooms was constant and voluminous.

37.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

38.    The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Shilo Inn Salem. Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at the Shilo Inn Salem.

39.    While held captive at the Shilo Inn Salem, A.B. encountered hotel staff evidencing obvious signs of abuse, including but not limited to visible bruising, malnourishment, being in a drugged state, and clothing inappropriate for the weather.

40.    Despite obvious signs of human trafficking, including but not limited to, (no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by

her trafficker with cash or debit while A.B. actually entered the room), rental by a man for a woman who did not enter the hotel at the same time, where consistent foot traffic was occurring, Defendant's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to Shilo Inn Salem hotel following these common signs of trafficking, Defendant Shilo refused to take any action to protect A.B.

41.    Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Shilo refused to take any actions to curtail these activities.

42.    Had Defendant been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

43.    The impact of being coerced and forced into sex trafficking at the Defendant's hotel has forever emotionally and physically injured A.B

### Sex Trafficking at the Residence Inn Portland Airport
### Owned and Operated by Summit Hotel TRS 085, LLC

44.    From approximately September 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon ("Residence Inn Portland").

45.    A.B.'s trafficker would intermittently rent rooms at the Residence Inn Portland for a few days at a time throughout 2012 through 2013.

46.    During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at the Residence Inn Portland in response to advertisements for commercial sex that her trafficker posted on websites such as backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February

25, 2013 through February 27, 2013

47.    When at the Residence Inn, Plaintiff A.B. was sold by her trafficker at each hotel to at least 7 "clients" per night or until the night slowed down.

48.    Plaintiff's trafficker would book her at the Residence Inn Portland anywhere from one (1) to four (4) nights at a time before being rotated to other hotels, and would generally be placed at the Residence Inn Portland up to two times in the same month, or 6 to 12 stays over 4 to 5 months. Specifically, but not limited to the following dates, Plaintiff recalls she was trafficked at the Residence Inn Portland from February 28, 2013 through March 2, 2013; March 11, 2013 through March 12, 2013, and March 19, 2013 through March 21, 2013.

49.    The trafficker was a local to the area but always booked and paid for the rooms directly from the front desk and using a Residence Inn Portland employee's discount card. He often paid for the room using his debit card or cash and used the employee discount code. After booking the room, the trafficker would request two keys and take one key to A.B., who would have to wait for him in the car. Each time, A.B. would then proceed to walk to the room by herself, often through the front door and past the lobby, without ever having registered as a guest.

50.    The trafficker would then re-enter the hotel and continue to book dates from the hotel area, including the lobby, where he would have sat for long periods of time.

51.    Plaintiff's trafficker was also permitted to use an employee discount for the rooms he booked, obviously without being an employee—data which certainly would have been suspicious and known to Defendant Summit through the central reservation system.

52.    During times A.B. was with a "buyer," the trafficker would use the hotel's Wi-Fi to post advertisements on backpage.com and set up "dates." At the Residence Inn Portland, the trafficker often set up in the hotel lobby with his computer and several other electronic devices to book additional "dates" or "johns" and the trafficker would often use the hotel's Wi-Fi to record the sex acts taking place with A.B. from inside the room he booked.

53.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag

on connectivity throughout the hotel.

54.    Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

55.    Each buyer entering the Residence Inn Portland was a non-paying guest and left shortly after her arrived. Her trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant's Residence Inn Portland Airport hotel. The foot traffic to the rooms was constant and voluminous.

56.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

57.    Plaintiff alleges that on at least two or more occasions, a room was rented at the Residence Inn Portland where she and another girl were forced to share a room. The Plaintiff and the other girl would alternate in and out of the room meeting "clients" or "dates" and neither one would leave the property.

58.    Both A.B. and the trafficker were arrested on property while registered guests at the Residence Inn Portland.

59.    A.B. was directed to avoid eye contact with hotel staff and to not to engage in conversation with anyone. Despite numerous surveillance cameras throughout the hotel displaying unusual and suspicious behavior, no help or attention was given to A.B. by any hotel staff.

60.    The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Residence Inn Portland. Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at the Residence Inn Portland.

61.    Despite obvious signs of human trafficking, including but not limited to, (no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by her trafficker with cash or debit while A.B. actually entered the room), rental by a man for a woman

who did not enter the hotel at the same time, where consistent foot traffic was occurring, Defendant's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to Residence Inn Portland hotel following these common signs of trafficking, Defendant Summit's hotel staff still refused to take any action to protect A.B.

62.     Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Summit refused to take any actions to curtail these activities.

63.     Had Defendant been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

64.     The impact of being coerced and forced into sex trafficking at the Defendant's hotel has forever emotionally and physically injured A.B.

## B. DEFENDANTS' KNOWLEDGE OF THE ROLE OF THEIR HOTELS IN THE SEX TRAFFICKING INDUSTRY

65.     Defendants, as hotel owners, operators, managers, and supervisors, have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so." [6]

66.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for Defendants. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched trainings

---

[6] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

and toolkits have been published over the last decade to help hotel staff in every position to identify the signs. [7]

67.    Hotels, like the Shilo Inn Salem and Residence Inn Portland, play a crucial role in the sex trade. [8] The trope of the "no-tell motel," is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability – particularly when traffickers pay for rooms in cash - making them ideal venues for crime and sex trafficking in particular.

68.    In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The 2010 Trafficking in Persons Report stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and forced prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009. [9]

69.    During a speech in New York City in September 2012, President Obama stated that human trafficking, "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community because it tears at our social fabric. It ought to concern every business because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime." [10]

70.    Despite efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, including Defendants, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place

---

[7] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[8] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.
[9] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[10] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-globalinitiative.

in a hotel.[11]

71.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[12] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[13]

72.    Hotels are *the* venue of choice for sex trafficking.[14] Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as, "in call."

73.    Hotels are also the venue of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room, and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.*, those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

74.    Traffickers and buyers capitalize Defendants' general refusal to adopt and enforce companywide anti-trafficking policies, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

75.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, Defendants, in their capacity within hospitality industry, have the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

76.    As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has

---

[11] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[12] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.com/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[13] U.S. Dep't of State, 2016 Trafficking in Persons Report (2016), at 387, available at https://www.state.gov/documents/organization/258876.pdf.
[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

an inherent responsibility to deter the crime and can be liable for failing to do so."[15]

77.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

78.     From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking in the hotels they own and operate.

79.     Obvious signs of sex trafficking at a hotel, including Defendants' hotels, may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[17]

80.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[18] Thus, hospitality companies such as Defendants are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand and

---

[15] *Supra* at note 11.
[16] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[17] *Id.; see also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf;)
[18] *Supra* at note 11.

hotel standards.

81.    Hospitality companies such as Defendants can and should mandate that all staff working at all hotels they own, operate, franchise, and operate complete sex trafficking training.[19]

82.    Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource center.[20]

83.    "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…[u]nfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff.[21]

84.    Defendants have been cognizant of their role and responsibilities in the sex trafficking industry for years.

85.    Nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[22]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and Defendants. Both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[23]

86.    Hospitality companies such as Defendants have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly refuse to heed the call or repeatedly refuse to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

---

[19] *Id*.
[20] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[21] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[22] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[23] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

## C. DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

### 1. Defendant Shilo Has Been Aware of Sex Trafficking Occurring at Their Hotel and Had Personal Knowledge of Plaintiff's Sex Trafficking at the Shilo Inn Salem

87.    Defendant Shilo has personal knowledge of the trafficking of Plaintiff at the Shilo Inn Salem. As outlined *supra*, Shilo Inn Salem's own employees and hotel staff frequently observed and facilitated the sex trafficking of A.B. at the Shilo Inn Salem.

88.    A brief examination of just a handful of examples demonstrate the frequency with which the Defendant has long received and continues to receive evidence and reports that human trafficking runs rampant at the Shilo Inn Salem hotel where A.B. was trafficked:

a.    Regarding a 2015 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "The first night we were unable to park in the parking lot due to an ongoing investigation and the dead body in the entrance…"

b.    Regarding a 2016 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "… I could hear the people above me and next to me having very loud sex…"

c.    Regarding a 2017 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "…Noticed some sketchy people around the builiding, including some guests…"

d.    Regarding a 2019 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "Lots of tweakers and prostitute."

e.    Regarding a 2019 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "…This place has all the signs of a poorly managed hotel. We visiting about a month ago now and arrived a few hours after our reservation. As soon as we walked in the warning signs

were there. There was a long wait and everyone looked grumpy. We quickly found out that some of there cleaning staff had quit (apparently) and many people were waiting for hours for their rooms. When we finally did get to our room, we found used condoms in the room. Spend the extra cash and visit one of the nicer hotels in Salem."

 f. Regarding a 2020 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "…A woman was arrested while we were there. She was drunk and assaulting people. There were creepy men roaming the halls…"

 g. Regarding a 2021 stay at the Shilo Inn located at 3304 Market St NE, Salem, OR 97301, a hotel customer wrote a review saying, "…It was super unorganized and dirty looking in the lobby too, and many drugged out people coming in and out and also hanging around the building…"

89. Upon information and belief, online reviews similar to those outlined above provided Defendant with actual and/or constructive knowledge of sex trafficking, commercial sex, forced prostitution, and the foreseeable risk of sex trafficking at the Shilo Inn Salem.

90. Upon information and belief, the reviews quoted in this Complaint, amongst others, are within the possession, custody, and control of Defendant and may be produced in discovery.

**2. Defendant Summit Hotel Has Been Aware of Sex Trafficking Occurring at Their Hotel and Had Personal Knowledge of Plaintiff's Sex Trafficking at the Residence Inn Portland**

91. Upon information and belief, Defendant Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport ("Summit") was apprised of instances of sex trafficking.

92. In addition, Defendant Summit has personal knowledge of the trafficking of Plaintiff at the Residence Inn Portland Airport. As outlined *supra*, the Residence Inn Portland employees openly observed signs of trafficking, did not aid Plaintiff, and thereby have constructive knowledge of and participated in the trafficking of A.B. at the Residence Inn Portland Airport.

93.    A brief examination of just a handful of examples to show the extraordinary frequency with which the Defendant has long received and continue receiving evidence and reports that human trafficking runs rampant at the hotel locations where A.B. was trafficked:

a.    Regarding a 2017 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "It was honestly great, however there WA s a gang shooting right outside my room and I called the front desk and they didn't give me any information so I could barely sleep. The only reason I found out was from the news reports."

b.    Regarding a 2022 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "This is getting 1 star because of the cleanliness. There were literal TOE NAIL CLIPPINGS in the kitchen sink. Nasty spots on the couch. The walls have spots on them of who knows what. Everything is sticky. Nothing is wiped down. Crumbs on the floor. I'm pretty sure they just replace the towels and trash and wipe down the most obvious messes. It's nice that's is right next to target but I witnessed a homeless man Stealing a huge bag of items and security did absolutely nothing even when I husband pointed it out. There's drug needles in the flower beds. Vents are covered in dust. Seriously I'm so confused as to why this place is so dirty. Hairs all over. If you like living in filth this is the place for u!!"

c.    Regarding a 2022 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "Book someplace else, about a month ago our Brand new truck got broke into caused $3000 worth of damage. A lot of criminal activity around this location. Informed the staff they didn't seem to care says not their responsibility. This location not a very good "Marriott" quality."

94.    Upon information and belief, online reviews similar to those outlined above provided Defendant with actual and/or constructive knowledge of sex trafficking, commercial sex, forced prostitution, and the foreseeable risk of sex trafficking at the Residence Inn Portland.

95.    Upon information and belief, the reviews quoted in this Complaint, amongst others, are within the possession, custody, and control of Defendant and may be produced in discovery.

### 3. Each Defendant has been uniquely aware of trafficking at their hotels because of their internet policies

96.    Defendants each understand the importance that internet access can have to facilitate human trafficking.

97.    Internet access at their brand hotel properties is through two means:

   a.  First, Defendants Shilo and Summit provide internet access to guests through wireless internet accessible in their guest rooms; and

   b.  Second, Defendants Shilo and Summit provide internet access through publicly accessible wireless networks accessible in the lobby of other common areas of their brand hotels.

98.    Defendants collect data on internet usage through the wireless internet services that Defendants Shilo and Summit provide. Such data includes:

   a.  The IP address and other identifying information for all devices that access the internet through the Shilo Inn Salem and Residence Inn Portland's wireless networks;

   b.  The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

   c.  Information about the user accessing the internet through Shilo Inn Salem and Residence Inn Portland's wireless networks, including the users' room number, a user-provided name, and other identifying information.

99.    In violation of their federal statutory obligations under the TVPRA, Defendant

Shilo and Summit failed to monitor internet use at their hotel, in order to identify signs and perpetrators of commercial sex trafficking within their walls.

100.    Defendants Shilo and Summit knew or should have known of the prevalent use of websites like Backpage.com, Craigslist.com, and other similar websites traffickers use to pose advertisements for sex within their properties.

101.    Despite that knowledge, Defendant Shilo and Defendant Summit made no effort to flag or block the use of such websites by traffickers and instead exercised willful blindness to the use of their wireless networks to further human trafficking in their hotels, including the hotels where Plaintiff was trafficked.

102.    Defendants Shilo and Summit's blindness facilitated sex trafficking, forced prostitution, and other illegal activity at their hotels by allowing traffickers to advertise victims of sex trafficking through their own wireless networks in violation of their own policies on the use of said networks.

**D.    DEFENDANTS SHILO AND SUMMIT ARE DIRECTLY LIABLE UNDER SECTION 1595 FOR THEIR REFUSALS TO IMPLEMENT POLICY, PROCEDURE, OR TRAINING ON THE PREVENTION OF SEX TRAFFICKING AT THEIR HOTEL PROPERTIES.**

103.    Defendants Shilo Inn, Salem, LLC d/b/a Shilo Inn Salem and Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport have been on notice since as early as 2008, that sex trafficking occurs in the hotels they own, operate, supervise, and brand, and that the hotel industry is the hub of sex trafficking, yet all of them failed and persist in failing to fulfill their statutory responsibility resulting in commercial sex trafficking occurring in their owned, supervised, and operated properties.

104.    Defendant Shilo is directly liable under the TVPRA because it had constructive knowledge of the extensive sex trafficking occurring at its hotel.  Shilo Inn Salem's own employees observed the open and obvious signs and indicators of Plaintiff's sex trafficking.

105.    Despite its observations of Plaintiff's sex trafficking, Defendant Shilo benefited and profited from and received revenue directly from Plaintiff's trafficking via the rooms rented

by her trafficker.

106.    Defendant Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport is directly liable under the TVPRA because it had constructive knowledge of the extensive sex trafficking occurring at its hotel. Its own employees observed the open and obvious signs and indicators of Plaintiff's sex trafficking.

107.    Despite these open and obvious signs, the Summit Hotel TRS 085, LLC d/b/a Residence Inn Pleasant Hill profited from and received revenue directly from Plaintiff's trafficking via the rooms rented by her trafficker.

108.    Defendants Shilo Inn, Salem, LLC d/b/a Shilo Inn Salem and Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with the trafficker to provide a venue for sex trafficking.

109.    Defendants Shilo Inn, Salem, LLC d/b/a Shilo Inn Salem and Summit Hotel TRS 085, LLC d/b/a Residence Inn Portland Airport rented rooms to A.B.'s trafficker knowing while they knew, or should have known, that the trafficker was using the room to harbor sex trafficking victims such as A.B., physically assault them, and subject them to repeated exploitation as they were forced into sexual servitude.

110.    Defendants Shilo and Summit knew, or should have known, that sex trafficking victims were being trafficked at their hotels – including the Shilo Inn Salem and Residence Inn Portland – and that the they were benefiting from said exploitation, because A.B.'s trafficker frequented the Defendants' hotels and paid for the room rentals.

111.    Defendants Shilo and Summit profited from the sex trafficking of A.B. and knowingly or negligently aided A.B.'s traffickers. Defendants took no action as A.B. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment.

112.    Defendants Shilo and Summit refused to implement best-known anti-trafficking policies, practices, and procedures to maintain their profits.

113.    Defendants Shilo and Summit financially benefited from the sex trafficking of A.B. and other victims like her and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers).

114.    Defendants Shilo and Summit enjoy the steady stream of income that sex traffickers bring to their hotels, including the Shilo Inn Salem and Residence Inn Portland.

115.    Defendants Shilo and Summit benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

116.    Defendants Shilo and Summit maintained their deficiencies to maximize profits by:

    a.  Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.  Lowering operating costs and management costs by not analyzing the data they receive regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues;

    c.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

    d.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

117.    There was a continuous business relationship through the rental of rooms between Plaintiff's traffickers, Defendants Shilo and Summit, and the hotels they operated and owned: the Shilo Inn Salem and Residence Inn Portland Airport.

118.    Defendants Shilo and Summit participated in hotel operating ventures and knowingly or negligently provided lodging to A.B.'s trafficker in which to harbor A.B. while he was trafficking her and provided lodging and anonymity to those who purchased sex acts and exploited A.B.

119.    Defendants Shilo and Summit each had the opportunity to stop A.B.'s trafficker

and offenders like him from victimizing A.B. and others like her. Instead, each Defendant refused to take any reasonable measures to stop sex trafficking from occurring in their hotels.

120.    Defendants Shilo and Summit each refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their hotels.

121.    Even though Defendants Shilo and Summit were aware of the best policies, practices, and procedures necessary to fight human trafficking and despite their part in formulating, assessing, and promoting the best policies, practices, and procedures together, they refused to implement them by, among other acts, omissions, and commissions described in this Complaint:

        a.  Reducing the costs of training employees and managers on how to spot the signs of human trafficking;

        b.  Failing to refuse room rentals or report guests to law enforcement; and

        c.  Lowering a number of security costs and measures that could have combatted sexual trafficking and exploitation.

122.    To date, Defendants Shilo and Summit have failed to train all of their employees and/or agents to look for signs of trafficking.

123.    The failure to implement the best policies, practices, and procedures was not an oversight by Defendants Shilo and Summit.

124.    Due to Defendants Shilo and Summit's refusals to enact or implement any anti-trafficking policies and procedures, these Defendants, in essence, turned a blind eye to sex trafficking, including the sex trafficking of A.B. Therefore, these Defendants' failures to investigate and monitor human trafficking is sufficient to establish Defendants knew or should have known of human trafficking for commercial sex occurring at their properties, including the hotels where Plaintiff was trafficked.

125.    Defendants Shilo and Summit knew, or should have known, that sex trafficking victims were being trafficked because they constantly entertained foot traffic at the rented room to appease the traffickers' daily quotas. Defendants Shilo and Summit ignored the fact that the

traffickers would help check A.B. in and then not proceed to the room. These behaviors indicated that sex traffickers were using the Defendants' hotel rooms to subject A.B. to repeated exploitation and sex trafficking.

126.    As a direct and proximate result of these egregious practices on the part of Defendants Shilo and Summit, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**COUNT ONE – 18 U. S. C. § 1595 ("TVPRA")**
**(Against All Defendants)**

127.    Plaintiff incorporates each foregoing allegation as if fully stated herein.

128.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

129.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit from a venture which they knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a). At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff, her trafficker, and buyers in their hotels for the purposes of commercial sex induced by force, fraud, or coercion.

130.    Defendants benefited as a result of their acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyalty of traffickers and other individuals fueling the supply and demand of sex trafficking, and limiting mandatory regulations within their businesses. Moreover, Defendants knowingly benefited from Plaintiff's trafficking on each occasion they received payment or royalty fees for renting rooms at Defendants' hotels where Plaintiff, her trafficker, and numerous buyers were harbored. Defendants had actual or constructive knowledge of Plaintiff's trafficking but failed to implement or enforce anti-trafficking measures that would have helped her, and others like her. The actions, omissions, and/or commissions

alleged in this pleading were the but-for and proximate cause of Plaintiff's injuries and damages.

131.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels in violation of 18 U.S.C. § 1591(a).

### PRAYER OF RELIEF

WHEREFORE Plaintiff requests the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it awards damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.    All available compensatory damages for the described losses with respect to each cause of action;

b.    Past and future medical expenses, as well as the costs associated with past and future life care;

c.    Past and future emotional distress;

d.    Consequential and/or special damages.

e.    All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

f.    Disgorgement of profits obtained through unjust enrichment;

g.    Restitution;

h.    Punitive damages with respect to each cause of action;

i.    Reasonable and recoverable attorneys' fees;

j.    Costs of this action; and

k.    Pre-judgment and all other interest recoverable.

On the basis of the foregoing, Plaintiff also requests a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that it awards damages to Plaintiff in an amount which adequately reflects the enormity of Defendants' wrongs, and which will effectively

prevent other similarly caused acts. Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deem appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 16, 2023

Respectfully submitted,

*/s/ Kathryn L. Avila*
Kathryn L. Avila (OSB No. 185008)
**LEVIN PAPANTONIO RAFFERTY**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com

*/s/ Susanna Southworth*
Susanna L. Southworth, PhD, JD (*pro hac vice* forthcoming)
**RESTORE THE CHILD, PLLC**
2522 N Proctor St, Ste 85
Tacoma, WA 98406
T: (253) 392-4409
E: susanna@restorethechild.com

***Attorneys for Plaintiff***