**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

A.B., an individual,

Plaintiff,

vs.

INTERSTATE MANAGEMENT COMPANY, LLC d/b/a RESIDENCE INN PORTLAND AIRPORT

Defendants.

Case No.:  3:23-cv-00388-IM

SECOND AMENDED COMPLAINT

**FIRST AMENDED COMPLAINT**

Plaintiff A.B., by and through undersigned counsel, respectfully submits her second amended complaint for damages and makes the following averments:

**INTRODUCTION**

1.     For years, commercial sex traffickers have openly operated in and out of hotels, including the hotel properties owned, operated, and managed by Defendants while Defendants turn a blind eye to ongoing signs of sex trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, and earn substantial benefits and profits at the expense of human life, rights, and dignity.

2.     Defendants Interstate Management Company, LLC, d/b/a Residence Inn Portland Airport ("Interstate Management")[1] knew and have known for years that sex trafficking activity,

---

[1] Pursuant to a meet and confer on June 22, 2023, Plaintiff understands that Interstate Management

SECOND AMENDED COMPLAINT - **1**

including forced prostitution, repeatedly occurs on their properties.

3.      Despite such knowledge, Defendants Interstate Management instead turned a blind eye to evidence they knew or should have known were signs of sex trafficking in their hotels, including commercial sex acts by means of force, threats of force, fraud, or coercion, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no effort to train, educate, or otherwise raise awareness to stop the repeated abuses of victims at their properties.

4.      This action for damages is brought by Plaintiff, a survivor of sex trafficking, hereinafter identified by her initials, A.B., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

5.      A.B. was trafficked for commercial sex at the young age of 23 years old in Oregon. In order to keep a roof over her head, she was forced to "work" by her trafficker. A.B. was sold via commercial sex transactions at the Defendants' hotel properties through means of force, threats of force, fraud, or coercion. A.B. was preyed upon by a trafficker who bought, sold, and required her to subdue herself sexually to strangers. As she endured brutal physical assaults, psychological torment, and verbal abuse at the Defendants' hotel properties, Defendants turned a blind eye and continued to profit from A.B.'s victimization and exploitation.

6.      Plaintiff first met her trafficker in what she believed to be the beginning of a romantic relationship. Her trafficker used common methods of coercion, including complete control over her, threats of force and force, humiliation, degradation, exhaustion, isolation, choking, incurrence of debt, malnourishment, surveillance, blackmail, and other methods to force compliance.

7.      A.B.    was    advertised    on    websites    known    for    trafficking,    including

---

Company, LLC is the alleged proper party to Plaintiff's claims against the Residence Inn Portland Airport. Plaintiff reserves the right to rename Summit Hotel TRS 085, LLC as a Defendant if further discovery reveals that Summit Hotel TRS 085, LLC was involved in the management and/or operation of the Residence Inn Portland Airport during the subject trafficking period.

SECOND AMENDED COMPLAINT - **2**

www.backpage.com, whereby the Defendants, through their agreements, terms, or policies related to internet and software, provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise harbor A.B. for the purpose of sex trafficking. Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.B. to be sold repeatedly to buyers who frequented the Defendants' hotel properties to purchase victims of sex trafficking, including A.B.

8.      With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and consistent refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel property, A.B. was sex trafficked by means of force, threats of force, fraud, and coercion, sexually exploited, and victimized repeatedly at Defendants' hotels.

9.      A.B. was trafficked for commercial sex and suffered severe physical and emotional abuse under duress at Defendants' hotels.

10.     Plaintiff brings this action pursuant to 18 U.S.C. § 1595 against the Defendants who enabled, harbored, held, facilitated, turned a blind eye to, and financially benefitted from sex trafficking in which A.B. was trafficked by means of force, threats of force, fraud, and coercion for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of the TVPRA.

11.     The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in violations of the TVPRA.  Defendants turned a blind eye to knowledge regarding anti-trafficking efforts, including local advances made by local organizations and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking on their properties.

## **PARTIES**

12.     Plaintiff A.B. is a natural person who currently resides outside of Oregon.

SECOND AMENDED COMPLAINT - **3**

a. Plaintiff A.B. was a young adult when she first met the man who would become her trafficker. Using common methods of force, threat of force, fraud, and coercion, such as the ruse of a romantic relationship, the trafficker forced A.B. into commercial sex, selling her throughout hotels in Washington and Oregon. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102 (16).

b. Due to the sensitive nature of the allegations, Plaintiff A.B. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[2]

c. Generally, under the Federal Rules of Civil Procedure, pleadings must state the names of all parties.[3]  However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir. 1981); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

SECOND AMENDED COMPLAINT - **4**

d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and commercial sex trafficking. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

e.  Moreover, following the arrest of A.B. and her trafficker, A.B. remained under the manipulative and coercive control of her trafficker for multiple years.

f.  Even after A.B. was finally able to escape the coercive control of her trafficker, the trafficker continued to stalk A.B. and her family for years and made several attempts at unwanted contact despite a No Contact Order.

g.  In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy and safety interests substantially outweigh the customary practice of judicial openness.[6]

h.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's persona identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

13.  **Defendant Interstate Management Company, LLC ("Interstate Management")** is a Delaware Limited Liability Company with its principal place of business

---

[6] *Supra* n. 3 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

SECOND AMENDED COMPLAINT - **5**

located at 5851 Legacy Circle, Suite 400 Plano, Texas 75024. Defendant Interstate Management is a hospitality company and contracted with the hotel owner, Summit Hotel TRS 085, LLC, to manage, operate, supervise, and conduct business as the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon ("Residence Inn Portland"). Defendant Interstate Management directly offered public lodging services at the Residence Inn Portland.

    a.  Defendant Interstate Management can be served through its registered agent at CT Corporation System located at 780 Commercial Street SE, Suite 100, Salem, Oregon 97301.

    b.  Defendant Interstate Management has its principal place of business in Texas and regularly conducts business in Oregon.

    c.  Defendant Interstate Management is subject to the jurisdiction of this Court because it is an Oregon Corporation, maintains a registered agent in Oregon, regularly does business in Oregon, caused indivisible injuries to Plaintiff in Oregon, contracts to supply services in Oregon, and benefited from the sex trafficking of A.B. and other victims like her at the Residence Inn Portland located at 9301 NE Cascades Parkway, Portland, Oregon.

    d.  Defendant Interstate Management contracted with Summit Hotel TRS 085, LLC to manage and operate the Residence Inn Portland.

    e.  Defendant Interstate Management participated in a hotel operating venture by contracting with Summit Hotel TRS 085, LLC, to manage the hotel staff and employees at the Residence Inn Portland, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Residence Inn Portland where A.B. was trafficked.

    f.  Defendant Interstate Management knowingly benefited or received something

SECOND AMENDED COMPLAINT - **6**

of value from its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of A.B. through consistent room rentals at the Residence Inn Portland.

g.  Defendant Interstate Management was involved in police sting operations for prostitution.

h.  Defendant Interstate Management knew, or should have known, that A.B.'s trafficker was renting rooms in which to victimize and exploit A.B. due to the trafficker's personal relationship with "Residence Inn Employee A" by using the housekeeper's employee discount code multiple times over the course of A.B.s victimization.

i.  Defendant Interstate Management knew, or should have known, that "Residence Inn Employee A," an employee who they managed, was assisting and/or facilitating the sex trafficking of A.B.

j.  At all times that Plaintiff was trafficked at the Residence Inn Portland, Defendant Interstate Management failed or refused to require any human trafficking training despite knowing that trafficking, including commercial sex acts by means of force, threats of force, fraud, and coercion, was occurring at its hotel.

k.  Defendant Interstate Management benefits financially from the operating agreement entered into with Defendant Summit at the hotel property in which the Plaintiff was commercially sex trafficked.

l.  Defendant Interstate Management has benefited by turning a blind eye to rampant commercial sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their hotel.

## JURISDICTION AND VENUE

14.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

SECOND AMENDED COMPLAINT - 7

15.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

16.    Defendants have submitted to the jurisdiction of Oregon and have purposefully availed themselves of the privilege of conducting acts in Oregon through their dominion and control over their hotels and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Oregon; Oregon has an equally strong interest in protecting and assuring the safety of persons within its State

### SEX TRAFFICKING UNDER FEDERAL LAW

17.    The requirements for direct (or indirect) liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

18.    The TVPRA is a remedial statute and should be liberally construed. It is a cardinal principle of statutory construction that a statute should, on the whole, be construed so that no clause, sentence, or word shall be considered superfluous, void, or insignificant.

19.    Receipt of a percentage (or the entirety) of the room rentals from the rooms where A.B. was victimized and trafficked is sufficient for establishing a knowing financial benefit as well as licensing and other fees paid from room rentals under § 1595(a).

20.    Actual knowledge or a common business purpose is not necessary to establish "participation" under § 1595(a); to do so would render the "should have known" language in § 1595 meaningless.

21.    Plaintiff need not provide an underlying criminal offense under § 1591 in order to establish liability under the TVPRA.

22.    Constructive knowledge akin to a negligence standard is sufficient for

SECOND AMENDED COMPLAINT - **8**

establishing what Defendants "should have known" under § 1595(a).

23.     Being on notice of the prevalence of commercial sex trafficking generally and at hotels, in conjunction with the open and obvious signs of commercial sex acts by means of force, threats of force, fraud, and coercion at the Residence Inn Portland, are sufficient for constructive and actual notice.

## FACTUAL ALLEGATIONS

### A.  THE SEX TRAFFICKING OF A.B.

24.     The facts alleged herein stem from human trafficking for commercial sex in Oregon. While victimized and exploited by a trafficker, A.B. was continuously subject to repeated instances of rape, physical abuse, threats of physical abuse, verbal abuse, exploitation, psychological torment, and imprisonment at the Residence Inn Portland owned, operated, managed, and supervised by Defendants from approximately the end of 2012 through the end of March 2013.

25.     A.B. met her trafficker online in approximately September of 2012. Under the guise of seeking a romantic partnership, A.B. was thereafter manipulated and forced into commercial sex trafficking. The trafficker sold her as an escort on websites known for sex trafficking and forced prostitution such as Backpage.com. To maintain control over A.B., the trafficker both maintained surveillance of A.B. in the hotel room and secretly videotaped A.B. during forced commercial sex acts and used the recordings as blackmail.

### Sex Trafficking at the Residence Inn Portland Airport Operated and Managed by Interstate Management Company, LLC

26.     From approximately December 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking by means of force, threats of force, fraud, and coercion at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon

SECOND AMENDED COMPLAINT - **9**

("Residence Inn Portland").

27.    A.B.'s trafficker was a frequent customer and would intermittently rent rooms at the Residence Inn Portland for a few days at a time throughout 2012 through 2013. The trafficker booked and paid for the rooms personally interacting with the front desk multiple times over the trafficking period. The trafficker's interactions with hotel staff were recorded by video surveillance that covered the front desk area of the hotel lobby and showed anyone who checked in.

28.    During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at the Residence Inn Portland in response to advertisements for commercial sex that her trafficker posted on websites such as Backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February 25, 2013 through February 27, 2013

29.    When at the Residence Inn, Plaintiff A.B. was sold by her trafficker to at least 7 "clients" and up to 15 "clients" per night or until the night slowed down. On a typical day, the trafficker enforced a trafficking timeframe of about 1:00 p.m. to 2:00 a.m. and around 5:30 a.m. to 9:00 a.m.

30.    Plaintiff's trafficker would book her at the Residence Inn Portland anywhere from one (1) to four (4) nights at a time before being rotated to other hotels, and would generally be placed at the Residence Inn Portland at least two times in the same month, or at least 6 to 12 stays over 4 to 5 months. Specifically, but not limited to the following dates, Plaintiff recalls she was trafficked at the Residence Inn Portland from February 28, 2013 through March 2, 2013; March 11, 2013 through March 12, 2013; and March 19, 2013 through March 21, 2013.

31.    The trafficker was a local to the area but always booked and paid for the rooms directly from the front desk and using a Residence Inn Portland employee's ("Residence Inn Employee A") discount card belonging to a housekeeper. He often paid for the room using his debit card or cash and used the employee discount code.

SECOND AMENDED COMPLAINT - **10**

32.     Residence Inn Employee A, an acquaintance of the trafficker, initiated contact with A.B.'s trafficker on Facebook and offered to "rent a room" for him. Residence Inn Employee A's Fiancé was friends with the trafficker, and the Residence Inn Employee A and the trafficker had similar "friends" on Facebook. The trafficker "friended" Residence Inn Employee A after she offered to get him a discount on renting a room at the Residence Inn Portland.

33.     Because Residence Inn Employee A and A.B.'s trafficker were friends on Facebook, Residence Inn Employee A could see photos on the trafficker's Facebook page that were clear indicators that he was engaging in sex trafficking. These photos included displays of cash and images of the traffickers with multiple girls that were being exploited for sex—photos consistent with those included in hotel training programs as indicators of sex trafficking.

34.     Residence Inn Employee A indicated to police that she purposely changed the name on the personal reservation to the trafficker's name after initially reserving it under her name. Residence Inn Employee A received cash from the trafficker as a "thank you" for renting the room to him.

35.     Residence Inn Employee A interacted with the trafficker on Facebook messaging and on the hotel premises. A.B. interacted with Residence Inn Employee A on Facebook messaging.

36.     Residence Inn Employee A facilitated a reduced rate room rental for the trafficker on at least three separate occasions at the Residence Inn Portland, which Defendant Interstate Management would have knowledge of through the hotel's central reservation system. The trafficker used Residence Inn Employee A's discount code to rent rooms at other Residence Inns.

37.     After booking the room, the trafficker would request two keys and take one key to A.B., who would have to wait for him in the car. Each time, A.B. would then proceed to walk to the room by herself, either through the front door and past the lobby or a back door, without ever having registered as a guest. The trafficker would enter the lobby a few minutes after A.B.

38.     Once on the hotel property, A.B. had no freedom of movement. A.B.'s trafficker always escorted A.B. when she left the hotel room—to go work out, to get food, even to get ice.

SECOND AMENDED COMPLAINT - 11

The only time A.B. was allowed to leave the room unaccompanied by her trafficker was to let a "john" into the hotel or to meet a "john" in the lobby. Hotel staff would usually see A.B. either accompanied by her trafficker or a strange man or "john" returning to the hotel room with A.B. While A.B was on the property, the trafficker was either in the hotel lobby or in his car in the parking lot in front of the hotel. If A.B. left the hotel property, the trafficker escorted her. This observable conduct is consistent with training on indicators of sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work.

39.     An apparent and significant age difference existed between the trafficker and A.B. The trafficker was approximately nine years older than A.B. and A.B. looked younger than her age of 22.

40.     A.B.'s trafficker directed her to avoid eye contact with hotel staff and not to engage in conversation with anyone. This observable conduct is consistent with training on indicators of sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work. Defendants took no action as A.B. repeatedly visited the hotel, often with different guests or escorted by her trafficker who was significantly older than her, without any luggage, avoiding all eye contact and conversations, and always wearing inappropriate attire for the weather like spandex bootie shorts and a strappy top. A.B. would be dressed in the spandex bootie shorts and a strappy top whenever she left the room to meet a "john" and then would immediately return to the room with the "john."

41.     A.B. was visibly nervous and paranoid because she was fearful of not meeting the trafficker's expectations. If she did not do as she was told, the trafficker would yell at her and throw her on the bed or push her against the wall in the hotel room, causing loud noises. The trafficker wanted to scare A.B. but was cognizant of avoiding bruising. The trafficker also kept A.B. captive in the hotel room for longer periods of time if A.B. did not do what he wanted. This observable conduct is consistent with training on indicators of sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work. Despite numerous surveillance cameras throughout the hotel displaying unusual and suspicious behavior, no help or

SECOND AMENDED COMPLAINT - **12**

attention was given to A.B. by any hotel staff. The hotel security cameras would have recorded the trafficker frequently sitting in his car in front of the hotel, even in the cold, or in the hotel near the front door.

42.     Because the trafficker would get violent with A.B. and cause excessive noise, the trafficker was on the "do not rent" list for other hotels. Such loud noise also occurred at the Residence Inn Portland, but the staff took no action to respond to this observable conduct that is consistent with training on indicators of sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work.

43.     The trafficker would book "dates" from the hotel area, including the lobby, where he would have sat for long periods of time. The trafficker would post explicit advertisements on adult sexual exploitation websites to arrange "dates" with additional sex buyers for A.B., who he sold at the hotel property.

44.     During times A.B. was with a "buyer," the trafficker would use the hotel's Wi-Fi to post advertisements on Backpage.com and set up "dates." At the Residence Inn Portland, the trafficker often set up in the hotel lobby with his computer and other electronic devices to both constantly monitor A.B. by real-time video surveillance in the hotel room and download large files of recordings of A.B.'s commercial sex acts, and to post advertisements to book additional "dates" or "johns." In the hotel room, the trafficker had a laptop open on the desk facing the bed and used a software application to both record the sex acts and maintain constant, real-time surveillance of A.B. The trafficker would often use the hotel's Wi-Fi to record the live sex acts of A.B. from inside the room he booked and used these recordings as blackmail against her to force her to continue to be a victim of sex trafficking.

45.     Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotel directly by the slowing and delays caused by the drag on connectivity throughout the hotel.

46.     Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available

SECOND AMENDED COMPLAINT - **13**

and identifiable to the hotel and any third-party established to maintain and monitor Wi-Fi access. Upon information and belief, the Residence Inn Portland could have monitored and blocked access to commercial sexual transaction websites, such Backpage.com.

47. Each buyer entering the Residence Inn Portland was a non-paying guest and left shortly after he arrived. Sex buyers were not required to register with the hotel or register their vehicle information. A.B. would enter the lobby to meet sex buyers and would not leave the property. A.B.'s trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant's Residence Inn Portland Airport hotel. The trafficker would also continuously come and go from A.B.'s hotel room as well as spend lengthy periods of time in the lobby, posting ads and communicating with "johns" on his computer and phone. The foot traffic to the rooms was constant and voluminous.

48. When A.B. was in the hotel room, and as long as A.B. was at the Residence Inn Portland, the "Do Not Disturb" sign was on the hotel door, sometimes for days on end.

49. Plaintiff alleges that on at least two or more occasions, a room was rented at the Residence Inn Portland where she and another girl were forced to share a room. The Plaintiff and the other girl would alternate in and out of the room, meeting "clients" or "dates," and neither one would leave the property such that either one would be in plain view of hotel staff throughout the day or night. If A.B. was out of the hotel room and not meeting a "client" or "date," she was escorted by her trafficker.

50. The trafficker controlled A.B.'s food intake. Only the trafficker would bring food or groceries to the hotel room; never A.B. For the last month while A.B. was sex trafficked, A.B.'s trafficker restricted her to 500 calories per day and forced her to take human chorionic gonadotropin (HCG) drops to lose weight, causing her to feel and look fatigued when she left the hotel room. This observable conduct is consistent with training on indicators of sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work.

51. The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Residence Inn Portland. Hotel staff were inadequately trained and

SECOND AMENDED COMPLAINT - **14**

unprepared to address the ongoing torture A.B. endured while she was regularly trafficked for sex by means of force, threats of force, fraud, and coercion at the Residence Inn Portland. Had the staff been properly trained, they would have observed many indicators of sex trafficking by means of force, threats of force, fraud, and coercion.

52.    Hotel staff, including "Residence Inn Employee A" who provided the trafficker with her discount code for renting rooms, encountered obvious signs of human trafficking by means of force, threats of force, fraud, and coercion. Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the hotel room where A.B. was coerced and/or forced to perform sex acts. The "Do Not Disturb" sign was perpetually displayed, and housekeeping staff were consistently denied access to the hotel room, yet A.B. repeatedly made excessive requests for additional towels and linens. The trafficker always escorted A.B. if she left the room, unless she was leaving to meet a "john" at a hotel entrance or in the lobby.

53.    Despite obvious signs of human trafficking, including but not limited to, (no eye contact, the trafficker repeatedly visiting the hotel with different guests, without any luggage, underdressed for the weather and scantily clad, and frequent and long durations of stays of a noticeably older individual accompanied by one to two women who exhibited signs of trafficking) and multiple indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by her trafficker with cash or debit while A.B. actually entered the room), rental by a man for a woman who did not enter the hotel at the same time, where consistent foot traffic was occurring, Defendant's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to the Residence Inn Portland hotel following these common signs consistent with training on sex trafficking by means of force, threats of force, fraud, and coercion, not with consensual sex work, Defendant Interstate Management's hotel staff still refused to take any action to protect A.B.

54.    On or about March 19, 2013, the trafficker was arrested for promoting prostitution on the property while registered as guests at the Residence Inn Portland. According to the

SECOND AMENDED COMPLAINT - **15**

Portland Police Bureau Investigation Report, the police "received information from a community member by a concerned citizen of a female being forced into prostitution by a pimp…" Following this tip, a police officer pretended to be a "john" and set up a "date" with A.B. and contacted A.B. at the Residence Inn hotel room while, at the same time, the trafficker waited in the lobby of the hotel. The officer noted similar text messages visible on A.B.'s phone as the text messages visible on the screen of the trafficker's computer in the lobby. The trafficker possessed both a room key to the Residence Inn and a bulging pouch of cash in the trafficker's back pocket. Upon closer inspection of the trafficker's iPhone, the officer noted numerous text messages to another trafficking victim talking about "dates" or prostitution activities. The officer noted multiple text messages and missed calls through Google voice on the trafficker's phone that appeared to be "johns" inquiring about "dates."

55.    Defendant should have known about A.B.'s sex trafficking by means of force, threats of force, fraud, and coercion. Leading up to the trafficker's and A.B.'s arrest on or about March 19, 2013, the hotel staff had notice of criminal activity involving sexual crimes occurring on the property due to the Portland Police Bureau having logged CAD reports of such criminal activity on 12/22/2009 and 6/25/2012.

56.    Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Interstate Management refused to take any actions to curtail these activities.

57.    If Defendant Interstate Management had been attentive to the activities occurring at its hotel and on its property, along with the obvious red flags outlined above, it would have been impossible for them to overlook A.B.'s victimization.

58.    The impact of being coerced and forced into sex trafficking at the Defendant's hotel has forever emotionally and physically injured A.B.

SECOND AMENDED COMPLAINT - **16**

### B. DEFENDANTS' KNOWLEDGE OF THE ROLE OF THEIR HOTELS IN THE SEX TRAFFICKING INDUSTRY

59.     Defendants, as hotel owners, operators, managers, and supervisors, have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so." [7]

60.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for Defendants. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs. [8]

61.     Hotels, like the Residence Inn Portland, play a crucial role in the sex trade.[9] The trope of the "no-tell motel," is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability – particularly when traffickers pay for rooms in cash - making them ideal venues for crime and sex trafficking in particular.

62.     In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The 2010 Trafficking in Persons Report stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and forced prostitution around the world, but that only 4,166 trafficking

---

[7] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[8] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[9] Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

SECOND AMENDED COMPLAINT - **17**

prosecutions were successful in 2009.[10]

63.    During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community because it tears at our social fabric. It ought to concern every business because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[11]

64.    Despite efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, including Defendants, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[12]

65.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[13] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[14]

66.    Hotels are *the* venue of choice for sex trafficking.[15] Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as, "in call."

---

[10] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[11] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-globalinitiative.
[12] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[13] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[14] U.S. Dep't of State, 2016 Trafficking in Persons Report (2016), at 387, available at https://www.state.gov/documents/organization/258876.pdf.
[15] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

67. Hotels are also the venue of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room, and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.*, those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

68. Traffickers and buyers capitalize on Defendants' general refusal to adopt and enforce companywide anti-trafficking policies, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

69. Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, Defendants, in their capacity within the hospitality industry, have the greatest reach to prevent, identify, and thwart sexual exploitation where it is most likely to occur.

70. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

71. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

72. From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of

---

[16] *Supra* at note 10.

[17] See DEPARTMENT OF HOMELAND SECURITY, *Human Trafficking Response Guide for the Hospitality Industry.* Available at: https://www.dhs.gov/sites/default/files/2024-06/240624_bc_hospitality_toolkit.pdf (Accessed on September 8, 2024).

SECOND AMENDED COMPLAINT - **19**

reasonable security measures, hospitality companies could prevent regular sex trafficking in the hotels they own and operate.

73.    Obvious signs of sex trafficking at a hotel, including at the Residence Inn Portland, may include: a guest appearing to be deprived of food, water, sleep, etc.; a guest acting fearful, anxious, depressed, submissive, tense, nervous, etc.; a guest appearing to be traveling with few personal items or no luggage; a guest seeming to be with a "boyfriend" who is noticeably older; a guest dressing in appropriately for the season/weather; a guest appearing to have no control over their money or ID; a guest appearing to have no freedom of movement; constant use of the "Do Not Disturb" sign; an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; declining room service for several consecutive days, yet excessive requests for additional towels and new linens; significant foot traffic in and out of room(s) involving a constant stream of different men; a hotel guest who is noticeably older and prevents another individual from speaking for themselves; a hotel guest who is noticeably older constantly escorting another individual; or a guest controlling another's identification documents.[18]

74.    Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies such as Defendants are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand and hotel standards.

75.    Hospitality companies such as Defendants can and should mandate that all staff working at all hotels they own, operate, franchise, and operate complete sex trafficking

---

[18] *Id.; see also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf;)
[19] *Supra* at note 10.

SECOND AMENDED COMPLAINT - **20**

training.[20]

76.     Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[21]

77.     "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…[u]nfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff.[22]

78.     Defendants have been cognizant of their role and responsibilities in the sex trafficking industry for years.

79.     Nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took the initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[23]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and Defendants. Both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[24]

80.     End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[25] The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train

---

[20] *Id*.

[21] Polaris, Human Trafficking and the Hotel Industry (2015), available at https://polarisproject.org/resources/human-trafficking-and-hotel-industry.

[22] Recommendations for Hotels and Motels, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[23] DHS Blue Campaign Five Year Milestone, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[24] Human Trafficking and the Hospitality Industry, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[25] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacancy_Report.pdf.

SECOND AMENDED COMPLAINT - **21**

employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

81.    ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular websites for online sex ads," and monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests."[26]

82.    Training resources on preventing sex trafficking are readily available by organizations like Partners Against Child Trafficking (PACT) by ECPAT-USA.[27] (*See* Exhibit 1.) Their directive on their website to professionals in the hospitality and travel industry emphasizes their responsibility in preventing sexual exploitation:

> As a professional in the hospitality and travel industry, you play a crucial role in preventing child exploitation. Our resources provide industry-specific guidelines, training resources, and case studies that empower you to recognize and respond to signs of exploitation. By equipping professionals like you with knowledge and tools, we can create a united front against child trafficking within your sector.[28]

83.    Marriott International, the brand for the Residence Inn Portland, is a member of ECPAT, and signed the Code in January 2018.[29] Since its official launch by ECPAT in Sweden in 1998, the Code has developed into a global multi-stakeholder initiative to protect children from sexual exploitation in travel with the mission to provide awareness, tools, and support to

---

[26] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378 b/15 57342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.

[27] https://www.wearepact.org/for-professionals (last visited September 8, 2024).

[28] *Id.*

[29] https://ecpat.org/marriott-international-and-uber-latest-signatories-to-the-code/ (last visited September 8, 2024).

SECOND AMENDED COMPLAINT - **22**

the tourism industry.[30]

84.    The American Hotel Lodging Association (AHLA) is another readily available resource for training materials and affirms the critical role of the hospitality industry in preventing sex trafficking through training:

> AHLA is uniting the industry to prevent human trafficking. Since trafficking networks often rely on legitimate businesses—many in the tourism supply chain—to sustain their illicit and illegal operations, hoteliers are uniquely positioned to lead efforts to identify and disrupt this terrible practice. Every day, hoteliers play an important role in combatting trafficking through raising awareness, coordinating with law enforcement, and workforce training.[31]

85.    Hospitality companies such as Defendants have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly refuse to heed the call or repeatedly refuse to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## C.  DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTEL

### 1.  Defendant Interstate Management Has Been Aware of Sex Trafficking Occurring at Their Hotel and Had Personal Knowledge of Plaintiff's Sex Trafficking at the Residence Inn Portland

86.    Upon information and belief, Defendant Interstate Management d/b/a Residence Inn Portland Airport was apprised of instances of sex trafficking.

87.    In addition, Defendant Interstate Management has personal knowledge of the trafficking of Plaintiff at the Residence Inn Portland Airport. As outlined *supra*, the Residence Inn Portland employees openly observed signs of trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, did not aid Plaintiff, and thereby have constructive knowledge of and participated in the trafficking of A.B. at the Residence Inn

---

[30] See https://ecpat.org/resource/a-multi-stakeholder-initiative-to-protect-children-from-sexual-exploitation-in-travel-and-tourism/; see also https://www.ecpat.org/sectt/ (last visited September 8, 2024).

[31] https://www.ahla.com/sl-trafficking-prevention (last visited September 8, 2024).

Portland Airport.

88.    A brief examination of just a handful of examples shows the extraordinary frequency with which the Defendant has long received and continues to receive evidence and reports that human trafficking runs rampant at the Residence Inn Portland where A.B. was trafficked:

   a.   Regarding a 2017 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "It was honestly great, however there WA s a gang shooting right outside my room and I called the front desk and they didn't give me any information so I could barely sleep. The only reason I found out was from the news reports."

   b.   Regarding a 2022 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "This is getting 1 star because of the cleanliness. There were literal TOE NAIL CLIPPINGS in the kitchen sink. Nasty spots on the couch. The walls have spots on them of who knows what. Everything is sticky. Nothing is wiped down. Crumbs on the floor. I'm pretty sure they just replace the towels and trash and wipe down the most obvious messes. It's nice that's is right next to target but I witnessed a homeless man Stealing a huge bag of items and security did absolutely nothing even when I husband pointed it out. There's drug needles in the flower beds. Vents are covered in dust. Seriously I'm so confused as to why this place is so dirty. Hairs all over. If you like living in filth this is the place for u!!"

   c.   Regarding a 2022 stay at the Residence Inn Portland Airport located at 9301 NE Cascades Parkway, Portland, Oregon 97220, a hotel customer wrote a review saying, "Book someplace else, about a month ago our Brand new truck got broke into caused $3000 worth of damage. A lot of criminal activity

SECOND AMENDED COMPLAINT - 24

around this location. Informed the staff they didn't seem to care says not their responsibility. This location not a very good "Marriott" quality."

89.    Upon information and belief, online reviews similar to those outlined above provided Defendant with actual and/or constructive knowledge of sex trafficking, commercial sex, forced prostitution, and the foreseeable risk of sex trafficking at the Residence Inn Portland.

90.    Upon information and belief, the reviews quoted in this Complaint, amongst others, are within the possession, custody, and control of Defendants and may be produced in discovery.

### 2.  Defendants have been uniquely aware of trafficking at their hotel because of their internet policies

91.    Defendants understand the importance that internet access can have to facilitate human trafficking.

92.    Internet access at their brand hotel properties is through two means:

  a.  First, Defendants Interstate Management provide internet access to guests through wireless internet accessible in their guest rooms; and

  b.  Second, Defendants Interstate Management provide internet access through publicly accessible wireless networks accessible in the lobby of other common areas of their brand hotels.

93.    Defendants collect data on internet usage through the wireless internet services that Defendants Interstate Management provide. Such data includes:

  a.  The IP address and other identifying information for all devices that access the internet through the Residence Inn Portland's wireless networks;

  b.  The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

  c.  Information about the user accessing the internet through Residence Inn Portland's wireless networks, including the users' room number, a user-

SECOND AMENDED COMPLAINT - 25

provided name, and other identifying information.

94.    In violation of their federal statutory obligations under the TVPRA, Defendants Interstate Management failed to monitor internet use at their hotels, in order to identify signs and perpetrators of commercial sex trafficking within their walls.

95.    Defendants Interstate Management knew or should have known of the prevalent use of websites like Backpage.com, Craigslist.com, and other similar websites traffickers use to pose advertisements for sex within the Residence Inn Portland.

96.    Despite that knowledge, Defendants Interstate Management made no effort to flag or block the use of such websites by traffickers and instead exercised willful blindness to the use of their wireless networks to further human trafficking in their hotels, including the Residence Inn Portland where Plaintiff was trafficked.

97.    Defendants' blindness facilitated sex trafficking, forced prostitution, and other illegal activity at their hotels by allowing traffickers to advertise victims of sex trafficking through their own wireless networks in violation of their own policies on the use of said networks.

**D. INTERSTATE MANAGEMENT ARE DIRECTLY LIABLE UNDER SECTION 1595 FOR THEIR REFUSALS TO IMPLEMENT POLICY, PROCEDURE, OR TRAINING ON THE PREVENTION OF SEX TRAFFICKING AT THE RESIDENCE INN PORTLAND.**

98.    Defendants Interstate Management d/b/a Residence Inn Portland have been on notice since as early as 2008 that sex trafficking occurs in the hotel they own, operate, manage, supervise, and brand, and that the hotel industry is the hub of sex trafficking, yet they failed and persist in failing to fulfill their statutory responsibility resulting in commercial sex trafficking occurring in their owned, managed, supervised, and operated property.

99.    Defendants Interstate Management d/b/a Residence Inn Portland are directly liable under the TVPRA because they had constructive knowledge of the extensive sex trafficking occurring at their hotel. Their own employees observed the open and obvious signs and indicators of Plaintiff's sex trafficking, including commercial sex acts by means of force,

SECOND AMENDED COMPLAINT - **26**

threats of force, fraud, or coercion. Their own employee, "Residence Inn Employee A," directly facilitated the renting of hotel rooms for A.B.'s trafficker by providing the trafficker with her discount code.

100. Despite these open and obvious signs, Interstate Management d/b/a Residence Inn Portland profited from and received revenue directly from Plaintiff's trafficking via the rooms rented by her trafficker.

101. Defendants Interstate Management d/b/a Residence Inn Portland profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with the trafficker to provide a venue for sex trafficking.

102. Defendants Interstate Management d/b/a Residence Inn Portland rented rooms to A.B.'s trafficker while they knew, or should have known, that the trafficker was using the room to harbor sex trafficking victims such as A.B., manipulate, control, coerce, blackmail, and physically assault them, and subject them to repeated exploitation as they were forced into sexual servitude.

103. Defendants Interstate Management knew, or should have known, that sex trafficking victims were being trafficked at the Residence Inn Portland – and that they were benefiting from said exploitation because A.B.'s trafficker frequented the Defendants' hotels and paid for the room rentals.

104. Defendants Interstate Management profited from the sex trafficking of A.B. and knowingly or negligently aided A.B.'s traffickers. Defendants took no action as A.B. repeatedly visited the hotel, often with different guests or escorted by her trafficker who was significantly older than she, without any luggage, avoiding all eye contact and conversations, wearing inappropriate attire for the weather like bootie shorts and strappy tops, and exhibiting signs of being sex trafficked, including by means of force, threats of force, fraud, or coercion.

105. Defendants Interstate Management refused to implement readily available and best-known anti-trafficking policies, practices, and procedures to maintain their profits.

106. Defendants Interstate Management financially benefited from the sex trafficking

SECOND AMENDED COMPLAINT - **27**

of A.B. and other victims like her and developed and maintained business models that attract and foster the commercial sex market for traffickers (including buyers).

107. Defendants Interstate Management enjoy the steady stream of income that sex traffickers bring to the Residence Inn Portland.

108. Defendants Interstate Management benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

109. Defendants Interstate Management maintained their deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, and sexual exploitation and what steps to take;

    b. Lowering operating costs and management costs by not analyzing the data they receive regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues;

    c. Not providing proper oversight over their employees, including "Residence Inn Employee A," who facilitated the sex trafficking of A.B. by providing the trafficker with her discount code to rent hotel rooms;

    d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and/or

    e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, and sexual exploitation.

110. There was a continuous business relationship through the rental of rooms between

SECOND AMENDED COMPLAINT - **28**

Plaintiff's trafficker and Interstate Management, and the hotel they managed and operated: the Residence Inn Portland.

111. Defendants Interstate Management participated in hotel operating ventures and knowingly or negligently provided lodging to A.B.'s trafficker in which to harbor A.B. while he was trafficking her and provided lodging and anonymity to those who purchased sex acts and exploited A.B.

112. Defendants Interstate Management had the opportunity to stop A.B.'s trafficker and offenders like him from victimizing A.B. and others like her. Instead, Defendants refused to take any reasonable measures to stop sex trafficking from occurring in their hotels.

113. Defendants Interstate Management refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, and/or prevent sexual exploitation on their hotels.

114. Even though Defendants Interstate Management were aware of the best policies, practices, and procedures necessary to fight human trafficking and despite their part in formulating, assessing, and promoting the best policies, practices, and procedures together, they refused to implement them by, among other acts, omissions, and commissions described in this Complaint:

   a. Reducing the costs of training employees and managers on how to spot the signs of human trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion;

   b. Not providing proper oversight over their employees, including "Residence Inn Employee A," who facilitated the sex trafficking of A.B. by providing the trafficker with her discount code to rent hotel rooms;

   c. Failing to refuse room rentals or report guests to law enforcement; and

   d. Lowering a number of security costs and measures that could have combatted sexual trafficking, including commercial sex acts by means of force, threats of

SECOND AMENDED COMPLAINT - **29**

force, fraud, or coercion, and exploitation.

115.    To date, Defendants Interstate Management have failed to train all of their employees and/or agents to look for signs of trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion.

116.    The failure to implement the best policies, practices, and procedures was not an oversight by Defendants Interstate Management.

117.    Due to Defendants Interstate Management's refusals to enact or implement any anti-trafficking policies and procedures, Defendants, in essence, turned a blind eye to sex trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, including the sex trafficking of A.B. Therefore, Defendants' failures to investigate and monitor human trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, is sufficient to establish Defendants knew or should have known of human trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, occurring at their properties, including the Residence Inn Portland where Plaintiff was trafficked.

118.    Defendants Interstate Management knew, or should have known, that sex trafficking victims were being trafficked because they constantly entertained foot traffic at the rented room to appease the trafficker's daily quotas, in addition to turned a blind eye to the signs of sex trafficking at the Residence Inn Portland, including commercial sex acts by means of force, threats of force, fraud, or coercion, discussed *supra*. Defendants Interstate Management ignored the fact that the trafficker would help check A.B. in and then not proceed to the room, but otherwise would always escort A.B. on the hotel property unless she was going to the lobby to meet a "john." These behaviors indicated that sex traffickers were using the Defendants' hotel rooms to subject A.B. to repeated exploitation and sex trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion.

119.    As a direct and proximate result of these egregious practices on the part of Defendants Interstate Management, A.B. and victims of sex trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, and exploitation like her, have

SECOND AMENDED COMPLAINT - **30**

been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**COUNT ONE – 18 U. S. C. § 1595 ("TVPRA")**
**(Against All Defendants)**

120.   Plaintiff incorporates each foregoing allegation as if fully stated herein.

121.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

122.   Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit from a venture which they knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a). At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff, her trafficker, and buyers at the Residence Inn Portland for the purposes of commercial sex induced by force, the threat of force, fraud, or coercion.

123.   Defendants benefited as a result of their acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyalty of traffickers and other individuals fueling the supply and demand of sex trafficking, and limiting mandatory regulations within their businesses. Moreover, Defendants knowingly benefited from Plaintiff's trafficking on each occasion they received payment or royalty fees for renting rooms at Defendants' hotels where Plaintiff, her trafficker, and numerous buyers were harbored. Defendants had actual or constructive knowledge of Plaintiff's trafficking, including commercial sex acts by means of force, threats of force, fraud, or coercion, but failed to implement or enforce anti-trafficking measures that would have helped her, and others like her. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of Plaintiff's injuries and damages.

124.   Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel, the Residence Inn Portland,

SECOND AMENDED COMPLAINT - **31**

in violation of 18 U.S.C. § 1591(a).

## **PRAYER OF RELIEF**

WHEREFORE Plaintiff requests the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it awards damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. Past and future medical expenses, as well as the costs associated with past and future life care;

c. Past and future emotional distress;

d. Consequential and/or special damages;

e. All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

f. Disgorgement of profits obtained through unjust enrichment;

g. Restitution;

h. Punitive damages with respect to each cause of action;

i. Reasonable and recoverable attorneys' fees;

j. Costs of this action; and

k. Pre-judgment and all other interest recoverable.

On the basis of the foregoing, Plaintiff also requests a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that it awards damages to Plaintiff in an amount which adequately reflects the enormity of Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deem appropriate under the circumstances.

SECOND AMENDED COMPLAINT - **32**

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims so triable.


Dated: September 12, 2024                    Respectfully submitted,

*/s/ Joel Shapiro*
Joel Shapiro, OSB #003814
**Law Office of Joel Shapiro, LLC**
1420 NW Lovejoy Street, Suite 631
Portland, OR 97209
T: 971-999-1889
E: joel@joelshapirolaw.com


*/s/ Susanna Southworth*
Susanna L. Southworth, PhD, JD (*Pro hac vice*)
**RESTORE THE CHILD, PLLC**
2522 N Proctor Street, Suite 85
Tacoma, WA 98406
T: (253) 392-4409
E: susanna@restorethechild.com


***Attorneys for Plaintiff***

SECOND AMENDED COMPLAINT - **33**